IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

| | | |
|---|---|---|
| WESTERN SURETY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CADDELL CONSTRUCTION | ) | |
| COMPANY, INC., an Alabama | ) | NO. 7:21-CV-153-FL |
| Corporation; W.G. YATES & SONS | ) | |
| CONSTRUCTION COMPANY, | ) | |
| a Mississippi Corporation; CADDELL | ) | |
| YATES JOINT VENTURE, | ) | |
| a partnership between Caddell Construction | ) | |
| Company, Inc. and W.G. Yates & Sons | ) | |
| Construction Company, | ) | |
| | ) | |
| Defendants. | ) | |

- - - - -

| | | |
|---|---|---|
| CADDELL YATES JOINT VENTURE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 7:21-CV-156-FL |
| | ) | |
| WESTERN SURETY COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

These related cases are before the court on motions to dismiss and compel arbitration, and

motions to consolidate, by defendants in Case No. 7:21-CV-153-FL (the "153 action") (DE 19,

21), and plaintiff in Case No. 7:21-CV-156-FL (the "156 action") (DE 20, 22).  The motions have

been briefed fully, and in this posture, the issues raised are ripe for ruling.  For the following

reasons, the motions to dismiss and compel arbitration are granted, and the motions to consolidate are denied as moot.

## STATEMENT OF THE CASES

These cases arise out of a federal project for construction of the Wallace Creek Regimental Complex at the Marine Corps Base Camp Lejeune in Jacksonville, North Carolina (the "project"). The government awarded the project in 2008 to Caddell Yates[1] in a $181,882,000 contract (the "contract"). In furtherance of the contract, Caddell Yates entered into a subcontract for masonry work (the "subcontract") with Breslow Construction, LLC ("Breslow Construction"), which subcontract was incorporated into payment and performance bonds provided by Western Surety Company ("Western") to Caddell Yates (the "payment bond," the "performance bond," and, collectively, the "Breslow bonds").

Western commenced the 153 action September 13, 2021, seeking restitution from Caddell Yates for $2,144,164.21 in payments made under the Breslow bonds, on the theory that the Breslow Bonds and the subcontract are void and unenforceable because they were obtained through fraud and unclean hands. Western seeks judgment in the amount of its payments made, plus pre-judgment interest, as well as attorneys' fees and costs.

Caddell Yates commenced the 156 action in Onslow County Superior Court August 30, 2021, whereupon it was removed by Western to the instant court. In the 156 action, Caddell Yates asserts that Western breached the same performance bond, as well as the subcontract, by failing to indemnify Caddell Yates for costs it incurred in defending itself in a False Claims Act ("FCA")

---

[1] In this instance, Caddell Yates refers to Caddell Yates Joint Venture, a partnership between Caddell Construction Company, Inc. and W.G. Yates & Sons Construction Company. For purposes of the instant order, for ease of reference, the court occasionally uses the Caddell Yates reference both as a shorthand for the Caddell Yates Joint Venture and to refer to all the defendants in the 153 action collectively, where this distinction is not material to the instant analysis.

action related to the project, the contract, and the subcontract, captioned: <u>United States ex rel.</u> <u>Rickey Howard v. Caddell Construction Company, Inc. et al.</u>, No. 7:11-CV-270-FL (E.D.N.C.) (the "FCA action"). In the 156 action, Caddell Yates seeks a stay pending arbitration under the terms of the subcontract, and, alternatively, it seeks judgment on its indemnification claim, plus an award of attorneys' fees and costs.

Caddell Yates filed the instant motion to consolidate in both cases, and shortly thereafter, on October 29, 2021, filed the instant motion to dismiss and compel arbitration in both cases. Caddell Yates relies upon a declaration of Eugene F. Rash, its counsel. Western filed a response to the motion to consolidate, and a memorandum in opposition to the motion to dismiss and to compel arbitration, relying upon declarations of Laurence P. Jortner, claims adjuster for Western, and C. Hamilton Jarrett, counsel for Western.

**STATEMENT OF FACTS**

A.      The 153 action

The allegations in Western's complaint in the 153 action may be summarized as follows. As "the successful prime contractor on the [project]," Caddell Yates "was required to prepare a Small Business Subcontracting Plan and required to make a 'a good-faith effort to achieve the dollar and percentage goals and other elements in its subcontracting plan.'" (Compl. ¶ 123 (quoting 13 C.F.R. § 125.3(c)(ii)). "The restrictions on small business subcontracting were designed to protect the public . . . from fraud." (<u>Id.</u> ¶ 124). "The Small Business Act [SBA] requires agencies to employ a variety of preference strategies to assist small businesses, in furtherance of Congress' declared policy to 'promote the business development of small business concerns owned and controlled by socially and economically disadvantaged individuals.'" (<u>Id.</u> ¶ 124 (quoting 15 U.S.C. §§ 631(f); 637)). According to Western's complaint, "[t]he purpose of the subcontracting

3

restrictions is to prevent other than small firms from forming relationships with small firms to evade SBA's requirements." (Id. ¶ 126).

Caddell Yates initially entered into a subcontract with Pompano Masonry Corporation (hereinafter, "Pompano Masonry" and the "Pompano Masonry Subcontract") "for the masonry work on the [p]roject; payment and performance bonds were issued by [Western] for [Pompano Masonry Subcontract]; Pompano Masonry commenced work under that [Pompano Masonry Subcontract] and submitted at least two applications for payment to [Caddell Yates]." (Id. ¶ 127). Caddell Yates "recognized and acknowledged that Pompano Masonry was in fact a large business, and it could not qualify as a small business under the SBA regulations, and that [Caddell Yates] could not satisfy the requirements of its Small Business Subcontracting Plan with Pompano Masonry as a subcontractor." (Id. ¶ 128).

Caddell Yates "dealt with representatives of Pompano Masonry in negotiating the Pompano Masonry Subcontract and dealt with those same Pompano Masonry representatives in addressing [Caddell Yates's] need to obtain more small business participation from Pompano Masonry; and the ownership of Pompano Masonry was discussed in detail." (Id. ¶ 129). Caddell Yates "representatives advised the Pompano Masonry representatives that because Pompano Masonry was a large business, it needed to buy materials from a minority supplier and find a minority business to which it could subcontract some of the masonry work." (Id. ¶ 130). Caddell Yates "representatives also discussed with Pompano Masonry representatives the need to break up the Pompano [Masonry] Subcontract and contract directly with Pompano Masonry's small business subcontractors in order to increase [Caddell Yates's] small business subcontracting, that they needed to contract with a small business to perform the masonry work." (Id. ¶ 131). Caddell

4

Yates representatives allegedly "stated that the going rate for such assistance was one to three percent of the Pompano Masonry [Sub]contract amount." (Id.).

Thereafter, according to the complaint, "representatives of Pompano Masonry discussed with representatives of [Caddell Yates] the possibility of running the entire masonry subcontract through a women-owned small business to be set up by Pompano Masonry." (Id. ¶ 132). "In response to this request . . . , Julian Marie Breslow and Stephen Siegel began the process of setting up a woman owned small business to assume the Pompano Masonry Subcontract, in order to assist [Caddell Yates] in satisfying its Small Business Subcontracting Plan." (Id. ¶ 133). "That new company was formed as Breslow Construction." (Id.). According to the complaint, "[r]epresentatives of [Caddell Yates] dealt with representatives of Pompano Masonry in drafting a contract with Breslow Construction for Breslow Construction to perform the masonry work covered under the Pompano Subcontract." (Id. ¶ 134).

Western asserts that Caddell Yates "was fully aware that Breslow Construction did not qualify as a small business under the applicable [Federal Acquisition Regulations] and SBA regulations due to Breslow Construction's affiliation with Pompano Masonry." (Id. ¶ 135). "At the time the Breslow Subcontract was being formed, [Caddell Yates] had been provided documents showing both the Pompano Masonry and the Breslow Construction corporate structures, both of which showed the common ownership and control of Breslow Construction by Pompano Masonry." (Id. ¶ 136). Caddell Yates allegedly "knew that Breslow Construction and Pompano Masonry shared common owners, officers, managers, and employees; that Pompano Masonry controlled or had the power to control Breslow Construction; and that Pompano Masonry would be performing all of the work under the Breslow Subcontract." (Id. ¶ 137). Thus, according to the Western complaint, Caddell Yates "knew that Breslow Construction did not qualify as a small

business under the applicable SBA regulations, including its affiliation rules." (Id. ¶ 138). "Nonetheless, [Caddell Yates] listed Breslow Contracting as a small business in its Individual Subcontracting Reports (ISRs)," allegedly "in order to make it appear to the Government that [Caddell Yates] was satisfying the small business goals under its Small Business Subcontracting Plan." (Id. ¶ 139).

On the basis of the foregoing, Western claims that the subcontract "was created for an illegal purpose, in violation of the Small Business Act requirements, and is void and unenforceable." (Id. ¶ 140). Western also claims that "[t]he Breslow Bonds also are void and unenforceable, as being given to guarantee the performance of a void contract." (Id. ¶ 141). "The scope of the [subcontract] was legal on its face." (Id. ¶ 142). However, Western claims that "once [Caddell Yates] sought to use the [subcontract] for the illegal purpose of falsely satisfying the small business requirements under its Small Business Subcontracting Plan, the [subcontract] became void as against public policy." (Id.).

Western allegedly "did not discover the illegality of the [subcontract] until after [Western] had made payment to [Caddell Yates] in the amount of $1,339,195.81 in full satisfaction of [a] December 9, 2013, arbitration award in favor of [Caddell Yates] arising out of [Caddell Yates's] claim against the Breslow Bonds." (Id. ¶ 143) (hereinafter, the "Breslow Bonds arbitration"). That arbitration award arose from a Miller Act lawsuit between Breslow Construction and Caddell Yates concerning work allegedly not performed and payments allegedly not made under the subcontract. (Id. ¶ 116 (citing Case No. 7:10-CV-249-F (E.D.N.C.)). Western additionally "incurred legal and investigative fees in defending [Caddell Yates's] claim against the Breslow Bonds," in the amount of $804,968.40, for a total of $2,144,164.21 payments made in connection with the Breslow Bonds arbitration. (Id. ¶ 143).

According to the complaint, Western discovered "the illegality of" the subcontract on or about March 6, 2015, when Caddell Yates "made another claim against the Breslow Bonds to recover legal fees and expenses it claimed to have incurred in defending" the FCA action. (Id. ¶ 144). "The pleadings in the [FCA action] were sealed until September 17, 2014; and [Western] did not review the pleadings in the [FCA action] until after receiving the aforesaid claim against the Breslow Bonds from Caddell Yates." (Id. ¶ 145). According to the complaint, "[h]ad [Western] discovered the illegality of the [subcontract] at the time [Caddell Yates] made its initial claim against the Breslow Bonds in connection with the [Breslow Bonds arbitration], [Western] would have denied the [Caddell Yates] claim, and not incurred the losses totaling $2,144,164.21." (Id. ¶ 146).

B.      The 156 Action

In its complaint, Caddell Yates asserts additional details about the subcontract, the Breslow Bonds, and the FCA Action, in claiming its entitlement to indemnification from Western for its defense costs in the FCA Action, and arbitration regarding the same.

Caddell Yates alleges that Breslow Construction returned to it the "fully executed" subcontract "for the performance of the masonry work for the [p]roject," on or about August 14, 2009. ('156 Compl. ¶ 18). The subcontract "has a typed date of March 2, 2009," but Caddell Yates allegedly "does not know the date Breslow [Construction] actually executed the [s]ubcontract." (Id.). According to Caddell Yates, "Breslow [Construction] purported to be a women-owned small business and had its attorney send a letter verifying that status to" Caddell Yates. (Id. ¶ 19). Caddell Yates allegedly "relied in good faith on Breslow [Construction's] self-certification of its women-owned small business status." (Id. ¶ 20).

Breslow Construction "was eventually determined not to qualify as a women-owned small business and that it had intentionally set up a sham small business." (Id. ¶ 21). According to Caddell Yates, the FCA action was brought "[a]s a direct result of Breslow [Construction's] false certification as a women-owned small business," against Caddell Yates, along with Julian Marie Breslow ("Breslow") and David J. Valdini & Associates, P.A. ("Valdini"). (Id. ¶ 22).

The plaintiff in the FCA action, Rickey Howard, was "a former estimator and president of operations for Pompano Masonry[,] a masonry contractor that was purchased by [Breslow] through [a] Julian Marie Breslow Revocable Living Trust Agreement." (Id. ¶ 23). "Breslow, in addition to being the managing member of [Breslow Construction], was director and chairperson of Pompano Masonry." (Id. ¶ 24). The FCA action "remained under seal while the government determined whether it would pursue the action on behalf of the United States." (Id. ¶ 25). "In September of 2014, the government partially intervened for purposes of settling claims against Valdini." (Id. ¶ 26; see Case No. 7:14-CR-11-D (additional guilty plea)). Breslow "pled guilty to making false statements to the United States in violation of 18 U.S.C. § 1001." (Id. ¶ 27; see Case No. 7:14-CR-8-D). "The government declined to pursue the [FCA] action against [Caddell Yates], but Howard continued pursuit of the action against [Caddell Yates]." (Id. ¶ 28). On March 30, 2021, this court granted summary judgment in favor of Caddell Yates on all claims in the FCA action. See United States ex rel. Howard v. Caddell Constr. Co., Inc., No. 7:11-CV-270-FL, 2021 WL 1206584, at *34 (E.D.N.C. Mar. 30, 2021). Caddell Yates "spent considerable sums defending itself against" the FCA action. (Id. ¶ 30).

In one of the Breslow Bonds, titled a subcontract performance bond, (the "performance bond"), Western as surety holds and binds itself in the amount of $14,702,263.00 to Caddell Yates for Breslow Construction's "full, proper, and timely performance" of the subcontract. (Id. ¶ 31;

8

see 153 action DE 1-22 at 2).  The performance bond identifies the subcontract and provides: "said [s]ubcontract by reference being fully incorporated into and made an integral part of this [performance bond]."  (153 action DE 1-22 at 2).  The subcontract, in turn, includes the following provision outlining the scope of Western's obligations as surety:

> 2.2  Any obligation of the Subcontractor under this Subcontract, including but not limited to warranty or other performance obligations extending beyond substantial completion, shall be equally the obligation of the surety for the Subcontractor's performance bond as if all terms and conditions of this Subcontract were set forth verbatim in the performance bond. The Subcontractor's surety's obligations shall not terminate upon substantial or final completion of either the Subcontractor work or of the Project as a whole but shall continue thereafter for so long as the Subcontractor has any obligations of whatever nature under this Subcontract. The Subcontractor's surety shall be bound by any Judgment, arbitration award, settlement agreement, or other decision rendered against the Subcontractor with respect to the Subcontractor's obligations under this Subcontract.

(Subcontract § 2.2 (153 action DE 1-21 at 7)).[2]  With respect to indemnification, the subcontract provides:

> 11.0  To the fullest extent permitted by law, the subcontractor covenants to defend, indemnify, hold harmless, protect, and exonerate both the contractor and its affiliates, agents, employees, representative, and sureties and the owner, architect, and engineers, jointly and severally, from and against any and all liability, claims, damages, losses, suits, actions, demands, liens, arbitrations administrative proceedings, awards, judgments, expenses, costs, and attorneys' fees pertaining to economic loss or damage, labor disputes, safety requirements, performance or non-performance of obligations, certifications, property rights of third parties, personal injury, bodily injury, sickness, disease, death, or damage to or destruction of property (including loss of use thereof) which (i) are caused in whole or in part by the subcontractor (herein defined to include but not be limited to the subcontractor's owners, employees, agents, representatives, subcontractors, suppliers, contractees, and invitees or other third parties connected with the subcontract or the agents or employees of any of them), (ii) arise from or occur in connection with work undertaken or to be performed by the subcontractor, regardless of whether the same is within or beyond the scope of work, or (iii) arise from or are connected with any other act or omission relating to the subcontractor, this subcontract, or the subcontract work.  It is the specific and express intent of this subcontract for the

---

[2]    In this order, all page numbers in citations to docket entry (DE) numbers are to the page number specified by the court's case management/electronic case filing (CM/ECF) system, and not the page number showing on the face of the underlying document, if any, unless otherwise specified.

foregoing covenants and indemnity obligations to apply to the fullest extent permitted by applicable law, regardless of whether the liability is caused in whole or in part by a party indemnified hereunder including, without limitation, whether or not the same be caused by, or arise out of, the joint, concurrent, or contributory negligence of a party indemnified hereunder.

(Subcontract § 11.0 (153 action DE 1-21 at 13)).[3]  Regarding arbitration, the subcontract provides that "[a]ll claims, disputes and other matters in question arising out of, or relating to, this Subcontract, . . . shall be firmly decided by binding arbitration in accordance with the Construction Industry Arbitration Rules (AAA Rules) of the American Arbitration Association (AAA)." (Subcontract § 14.1.2 (153 action DE 1-21 at 15)).

Caddell Yates asserts that it made a demand upon Western for indemnity for its defense costs in the FCA action, but that Western has refused to so indemnify Caddell Yates.  (156 action Compl. ¶¶ 39, 44).  As such, Caddell Yates claims Western has breached the performance bond and it is entitled to recover from Western all of its defense costs in the FCA action. (Id. ¶¶ 44-45). Further, Caddell Yates asserts that this claim must be resolved in arbitration.  (Id. ¶ 48).

In the 156 action, Western denies any obligation to indemnify Caddell Yates for defense costs in the FCA action, and it asserts counterclaims that are identical to its claims in the 153 action.   Additional contentions and details regarding the terms of the subcontract are set forth in the court's analysis.

## COURT'S DISCUSSION

Section 4 of the Federal Arbitration Act ("FAA") authorizes a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition [a] United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  It further provides that, when

---

[3]     The above quoted indemnification provision appears in bold, all caps, and underlining in the subcontract, which the court has removed for ease of presentation in the instant order.

presented with such a motion, a court "shall hear the parties, and upon being satisfied that the making of the agreement for arbitration . . . is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." Id.

In reviewing a motion to compel arbitration, the "court accepts as true the allegations in the complaint that relate to the underlying dispute between the parties." Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd., 944 F.3d 225, 233 (4th Cir. 2019) (quotations omitted). If, however, the "'making of the arbitration agreement be in issue,' then 'the court shall proceed summarily to the trial thereof.'" Id. (quoting 9 U.S.C. § 4). The court is obliged to conduct a trial only "when a party unequivocally denies 'that an arbitration agreement exists,' and 'show[s] sufficient facts in support thereof,'" under a summary judgment standard. Id. (quoting Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc., 807 F.3d 553, 564 (4th Cir. 2015)).

When faced with a motion to compel arbitration, the court analyzes only two "gateway matter[s]." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2006). First, the court must determine whether "a valid agreement to arbitrate exists between the parties." Hooters of Am., Inc. v. Phillips, 173 F.3d 933, 938 (4th Cir. 1999). Second, where the court concludes there is such an agreement, the court next asks whether "the specific dispute falls within the substantive scope of that agreement." Id.; see Chorley, 807 F.3d at 563.

Here, the "gateway matter[s]" are satisfied. Howsam, 537 U.S. at 83. First, a valid arbitration agreement exists between the parties, because an arbitration agreement is in writing as part of the subcontract, which is incorporated fully into the performance bond executed by Western. (See subcontract § 14.1.2 (DE 1-21 at 15) (hereinafter, the "arbitration agreement"); performance bond (DE 1-22 at 2)). Second, the dispute between the parties falls within the substantive scope of the arbitration agreement, which requires, in pertinent part, arbitration of

11

"[a]ll claims, disputes and other matters in question arising out of, or relating to," the subcontract. (Subcontract § 14.1.2 (DE 1-21 at 15)). Western's claims fall within this broad scope, because they seek to void the subcontract and the Breslow Bonds that incorporate it. (See, e.g., 153 action Compl. ¶¶ 140-141, 149, 155, 168). Caddell Yates's claim falls within this broad scope, because it seeks indemnity from Western "[p]ursuant to the terms of both the [s]ubcontract and the [p]erformance [b]ond." (156 action Compl. ¶ 38).

Western nonetheless argues that there is no valid agreement to arbitrate, based upon construction of the performance bond and the subcontract. It contends that "[n]othing in the [p]erformance [b]ond allows for arbitration of claims against the [p]erformance [b]ond." (Western Mem. (DE 25) at 7).[4] It points to a "time for suit" provision in the performance bond that states: "Any suit under this Bond may be instituted for the longest period of limitation permitted by the laws of the State in which the Project is located." (Performance bond § 3 (DE 1-22 at 4) (the "time for suit" provision). It also contends that other provisions in the subcontract that reference "either party" or a "party," or the surety separately, show that the arbitration agreement in the subcontract only applies to Breslow Construction and Caddell Yates, and not to Western. (Western Mem. at 8-9).

Western's argument raises an issue of contract interpretation under applicable North Carolina law. "Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." State v. Philip Morris USA Inc., 363 N.C. 623, 631 (2009). "It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument." Carolina Power & Light Co. v. Bowman, 229 N.C. 682, 693-

---

[4]     Where arguments raised in the 153 action and 156 action are the same, hereinafter all citations to briefs of the parties reference those filed in the 153 action.

94 (1949). Terms in a contract are to be "interpreted according to their usual, ordinary, and commonly accepted meaning." Anderson v. Allstate Ins. Co., 266 N.C. 309, 312 (1966). "Where the terms of the contract are not ambiguous, the express language of the contract controls in determining its meaning and not what either party thought the agreement to be." Crockett v. First Fed. Sav. & Loan Ass'n, 289 N.C. 620, 631 (1976).

"[A] contract is to be construed as a whole with each provision considered in the context of the entire contract." Lattimore v. Fisher's Food Shoppe, Inc., 313 N.C. 467, 473 (1985). "To incorporate a separate document by reference is to declare that the former document shall be taken as part of the document in which the declaration is made, . . . as if it were set out at length therein." Booker v. Everhart, 294 N.C. 146, 152 (1978). Further, "[t]he various terms of the contract are to be harmoniously construed, and if possible, every word and every provision is to be given effect." Singleton v. Haywood Elec. Membership Corp., 357 N.C. 623, 629 (2003).

Under these rules of interpretation, Western's arguments are unavailing. Its suggestion that nothing in the performance bond allows for arbitration is belied by the incorporation provision, under which the subcontract is "fully incorporated into and made an integral part of" the performance bond. (Performance bond (DE 1-22 at 2)). Thus, the whole subcontract and its arbitration agreement is integrated directly into the performance bond, "as if it were set out at length therein." Booker, 294 N.C. at 152. In turn, the arbitration agreement is broadly worded, applying to "[a]ll claims, disputes and other matters in question," without limitation to particular named parties, and without excluding Western from its application. (Subcontract § 14.1.2 (DE 1-21 at 15)). In order for "every provision" of the subcontract "to be given effect," Singleton, 357 N.C. at 629, the court cannot ignore the broad generally-applicable unqualified language of the arbitration agreement.

When the performance bond and the subcontract are read together as an integral whole, as they must be, other provisions within or in addition to the arbitration agreement do not serve to nullify its broad effect. For example, the "time for suit" provision in the performance bond specifying that "[a]ny suit under this Bond may be instituted for the longest period of limitation," upon which Western relies, does not evidence an intent to exclude Western from the application of the arbitration agreement. The time for suit provision is permissive, not mandatory, and it benefits the "Obligee," here Caddell Yates, by extending the limitation period as long as possible. (Performance bond § 3 (DE 1-22 at 4)). While its potential application may be limited under this interpretation to circumstances where parties waive their right to arbitrate, this interpretation does not render the time for suit provision without effect.

Other provisions in the subcontract that reference "either party" or a "party," or the surety, separately, also do not serve to exclude Western from application of the arbitration agreement. For example, Western points to § 14.1.2(g) of the arbitration agreement, which provides: "Subcontractor's surety agrees, if so requested by Contractor, to become a party to and be bound by the results of such arbitration." (Subcontract (DE 1-21 at 15) ("subsection (g)"). In light of the incorporation clause in the performance bond, coupled with the broad language of the arbitration agreement, there is no basis to interpret this subsection (g) to exclude Western from the arbitration agreement. If anything, this subsection (g) emphasizes and reinforces the intent of the parties to the integrated documents to involve Western in any arbitration related to the subcontract. An interpretation of subsection (g) that gives effect to all terms of the integrated documents is one that recognizes there may be circumstances where Caddell Yates and Breslow Construction are/were engaged in arbitration, at which point Western may later be included. It does not preclude Caddell Yates from compelling Western to arbitrate directly, as here.

14

Section 14.3 of the subcontract, upon which Western relies, also does not serve to exclude Western from the reach of the arbitration agreement. As it appears in the subcontract, that section states (with strikethrough font appearing in the original as shown):

> Should ~~the Contractor~~ (either party) through litigation, arbitration, or other means seek to recover on any surety bond given by the Subcontractor under this Subcontract, ~~the Subcontractor and its surety, jointly and severally,~~ agree to pay ~~Contractor~~ for all its costs, expenses, and attorneys' fees incurred in ~~the investigation preparation,~~ and trial or hearing of such matters and otherwise reasonably related thereto.

(Subcontract § 14.3 (DE 1-21 at 16)). References to "litigation," "either party," "surety bond" in this provision, however, do not render the arbitration agreement any narrower or any less applicable to Western. As with the "time for suit" provision in the performance bond, and subsection (g), these references do not evidence intent to reduce the force of the broad arbitration agreement, but rather reasonably cover contingencies that may, but need not, arise in the course of contract performance. Likewise, in this same manner, § 14.7, which applies "[s]hould Contractor and Subcontractor become involved in any action or legal proceeding arising out of, resulting from or pertaining in any manner to this Subcontract," (subcontract § 14.7 (DE 1-21 at 16)), references litigation without negating the force of the arbitration provision. Moreover, § 14.3 recognizes that a recovery on the surety bond may be through, inter alia, "arbitration," (subcontract § 14.3 (DE 1-21 at 16)), thus remaining consistent with application of the arbitration agreement to Western.

Western argues that this case is analogous to <u>CIP Constr. Co. v. W. Sur. Co.</u>, No. 1:18CV58, 2018 WL 3520832 (M.D.N.C. July 20, 2018), in which the district court denied a motion to compel arbitration of disputes arising from a performance bond that incorporated by reference a subcontract containing an arbitration agreement. <u>Id.</u> at *8. <u>CIP</u>, however, is instructively distinguishable, because the arbitration agreement in that case was a "narrower" scope arbitration agreement that expressly applied only to "a dispute between the parties with

respect to the terms of" the subcontract or "the parties' performance under" the subcontract. Id. at * 1, 6. This distinction was critical to the court's analysis in CIP, where it recognized that a different result could follow in the case of a "broad" arbitration clause, such as the one here, that contains the phrase "'arising out of or relating to' or similar language." Id. * 6. Indeed, the court recognized other cases in which a surety was compelled to arbitrate on the basis of a broad arbitration clause incorporated by reference into a performance bond. Id. * 7. Accordingly, CIP is inapposite.

Western also contends that limitations on discovery in § 14.1.2(e) of the arbitration agreement indicate that there was no intention to arbitrate disputes between Western and Caddell Yates on the performance bond. Western suggests that the arbitration agreement must relate to disputes between Breslow Construction and Caddell Yates only "because each party would have access to the people and documents necessary to put on their case and no further discovery would be necessary." (Western Mem. (DE 25) at 8). Interpreting the arbitration agreement and the subcontract, however, requires examining contract language to determine "the parties' intent at the moment of execution." Philip Morris, 363 N.C. at 631. Western's argument presupposes knowledge on the part of the parties in 2009 as to the nature of litigation that would ensue. The arbitration agreement and subcontract reveal by their terms no such presupposition. The arbitration agreement and the subcontract evidence only an intent to limit discovery for all parties to arbitration, not an intent to exclude Western from arbitration.

Western also suggests that it "would be gravely unfair to Western" to be limited in discovery, on the assumption that Caddell Yates and Breslow Construction would not need further discovery. (Western Mem. at 8). In some instances, an arbitration agreement can be rendered invalid by incorporating "rules so egregiously unfair as to constitute a complete default" of a good

faith agreement to arbitrate. <u>Hooters</u>, 173 F.3d at 938. However, "[b]ecause limited discovery is a consequence of perhaps every agreement to arbitrate, it cannot, standing alone, be a reason to invalidate an arbitration agreement." <u>In re Cotton Yarn Antitrust Litig.</u>, 505 F.3d 274, 286 (4th Cir. 2007). Accordingly, Western's suggestion that the discovery limitation here precludes arbitration is without merit.

With respect to the scope of the arbitration agreement, Western argues that its claims are beyond its scope because they "challenge the whole existence of" the performance bond and assert that the subcontract and performance bond are "void." (Western Mem. at 13). The arbitration agreement, however, is broad enough to cover all of Western's claims, however characterized. If an arbitration agreement is "susceptible to a meaning which covers the [parties'] dispute, [it] must be construed in favor of arbitration." <u>Washington Square Sec., Inc. v. Aune</u>, 385 F.3d 432, 437 (4th Cir. 2004). Any "ambiguities as to the scope of the arbitration clause itself" must be "resolved in favor of arbitration." <u>Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.</u>, 489 U.S. 468, 476 (1989).

Here, the arbitration agreement captures all claims "arising out of, or relating to" the subcontract. (Subcontract § 14.1.2 (DE 1-21 at 13). As such, as a matter of law, it is a broad or expansive arbitration clause that "embraces every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute." <u>J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.</u>, 863 F.2d 315, 321 (4th Cir. 1988). Viewed in this light, Western's claims that the performance bond is "void," "unenforceable," "illegal[,]" "against public policy," and thus lacks "existence," as Western argues, (e.g., Compl. ¶¶ 140-143, 167; Western Mem. at 13), all are "arising out of, or relating to" the subcontract. (Subcontract § 14.1.2 (DE 1-21 at 13). This is because, as the complaint itself alleges, the performance bond was "given to guarantee the

17

performance of" the subcontract. (Compl. ¶ 141). Also, as determined herein, the subcontract is "fully incorporated" into the performance bond as if one document. (Performance bond (DE 1-22) at 2). Accordingly, the disputes between the parties, at a minimum, have a "significant relationship" to the subcontract. J.J. Ryan, 863 F.2d at 321.

Western contends that the factual allegations in this case are analogous to Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287 (2010). Granite Rock is inapposite, however, for two reasons. First, Granite Rock addresses a narrower arbitration agreement pertaining "only to disputes that 'arise under'" a collective bargaining agreement. Id. at 304. Thus, unlike here, the arbitration agreement in Granite Rock did not cover disputes merely "related to" a contract. Second, Granite Rock concerns a dispute about when the collective bargaining agreement was "ratified," and whether it was ratified at the time a "no-strike dispute" took place. Id. at 305. If, the Supreme Court reasoned, the collective bargaining agreement "containing the parties' arbitration clause was not ratified, and thus not formed," until after the "the unions began their strike," then "there was no [collective bargaining agreement] for the . . . no-strike dispute to 'arise under.'" Id. Thus, unlike here, timing of formation of the underlying contract was key in Granite Rock to whether the dispute "arose under" the contract. Id.

Here, whether or not the underlying performance bond or subcontract is "void" as Western claims is not a question for this court to decide to determine the instant motion. Rather, "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 449 (2006). "[T]he issue of the contract's validity is considered by the arbitrator in the first instance." Id. at 446. In sum, where there is a written arbitration agreement that is valid in its terms, and where

the arbitration agreement is broad enough to cover the instant disputes, then the court must compel the parties to arbitrate their disputes under the terms of the arbitration agreement.

Finally, Western argues that, if the court compels arbitration, the location of the arbitration should be in North Carolina and the parties should be entitled to discovery. Upon determining that arbitration is required, however, "the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4 (emphasis added). The court thus lacks authority to change the procedural characteristics of the arbitration to which the parties have agreed, including the provisions that "the site of the arbitration shall be Montgomery, Alabama," and "there shall be no discovery except for the taking of up to three (3) depositions." (Subcontract § 14.1.2 (DE 1-21 at 15)). In addition, Western's arguments concerning such procedural aspects of the arbitration are for the arbitrator, not the court, to decide, if at all. See Howsam, 537 U.S. at 84.

Western cites James C. Greene Co. v. Great Am. E & S Ins. Co., 321 F. Supp. 2d 717, 722 (E.D.N.C. 2004), as authority for the proposition that the court should apply the following 11-factor "inconvenience" test in determining the proper forum of an arbitration:

> (1) the plaintiff's initial choice of forum; (2) the relative ease of access to sources of proof; (3) availability of compulsory process for attendance of unwilling witness; (4) possibility of a view of the premises, if appropriate; (5) enforceability of a judgement, if one is obtained; (6) relative advantage and obstacles to a fair trial; (7) other practical problems that make a trial easy, expeditious, and inexpensive; (8) administrative difficulties of court congestion; (9) local interest in having localized controversies settled at home; (10) appropriateness in having a trial of a diversity case in a forum that is at home with the state law that must govern the action; and (11) avoidance of unnecessary problems with conflicts of laws.

321 F.Supp.2d at 722. Many of these factors pertaining to a "trial" are manifestly out of place in the context of arbitration. Moreover, cases cited by James C. Greene Co. regarding application of this "inconvenience" test are not cases involving an order to compel arbitration under the Federal Arbitration Act. See, e.g., id. at 721-722 (citing Allen v. Lloyd's of London, 94 F.3d 923, 926

19

(4th Cir. 1996); Cable-La, Inc. v. Williams Commc'ns, Inc., 104 F. Supp. 2d 569, 572 (M.D.N.C. 1999)). Accordingly, James C. Greene Co. is in tension with courts that have applied a more limited analysis to forum provisions in arbitration agreements. See, e.g., KKW Enterprises, Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp., 184 F.3d 42, 52 (1st Cir. 1999) ("Courts may not rewrite the parties' agreements and compel arbitration of their dispute in a forum which is not one of those enumerated in an arbitration agreement's forum selection clause").

In any event, James C. Greene Co. is distinguishable. There, an arbitration agreement specified arbitration in New York, New York, but the court determined that the inconvenience factors favored arbitration in North Carolina. The court reasoned: "Neither parties have any connection at all with the state of New York as to either place of incorporation, the principle place of business, the purchase of the insurance, the adjustment (or lack thereof) of the two claims submitted to defendants, or as to the location of the two underlying lawsuits where plaintiff has itself been sued." 321 F.Supp.2d at 722. In the instant case, by contrast, Caddell Construction Company, Inc. is an Alabama corporation with a principal place of business in Montgomery, Alabama. (153 action, Compl. ¶ 2). In addition, Western already participated in an arbitration in Montgomery, Alabama, in 2011-2013, in accordance with the arbitration agreement in the subcontract. (Id. ¶ 120; see Case No. 7:10-CV-249-F, docket entry 24-2).

In sum, where there is no genuine issue concerning the making of the arbitration agreement that covers all the disputes between the parties, the court must compel arbitration of all claims in these actions in accordance with the terms of the arbitration agreement. Likewise, where all claims must be arbitrated, dismissal of these actions is warranted. See Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc., 252 F.3d 707, 709–10 (4th Cir. 2001). Finally, in light of this dismissal, the motion to consolidate is denied as moot.

## CONCLUSION

Based on the foregoing, the motions to dismiss and compel arbitration by defendants in Case No. 7:21-CV-153-FL (DE 21), and plaintiff in Case No. 7:21-CV-156-FL (DE 22), are GRANTED. The court DISMISSES these related actions and COMPELS the parties herein to arbitrate all claims in accordance with the arbitration agreement, as set forth herein. The motions to consolidate by defendants in Case No. 7:21-CV-153-FL (DE 19), and plaintiff in Case No. 7:21-CV-156-FL (DE 20), are DENIED AS MOOT.

SO ORDERED, this the 7th day of June, 2022.

LOUISE W. FLANAGAN
United States District Judge

21